## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ACADEMY EXPRESS, LLC,** <br> **Plaintiff,** <br><br> **v.** <br><br> **WASHINGTON METROPOLITAN** <br> **AREA TRANSIT AUTHORITY,** <br><br> **Defendant.** | **Case No. 1:20-cv-01374** |

### PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to FED. R. CIV. P. 65 and Local Civil Rule 65.1, Plaintiff Academy Express, LLC (hereinafter "Academy") moves for a preliminary injunction:

(1)  Requiring Defendant Washington Metropolitan Area Transit Authority ("WMATA") to cancel Task Order 1 awarded to Transportation Management Services, Inc. ("TMS") under WMATA Contract No. C20088C for Bus Bridge Services, and award the work to Academy, until the Court can make a final ruling in this case.

(2) Restraining WMATA from awarding Task Order 3 (or further Task Orders under the Contract) to TMS, until the Court can make a final ruling in this case.

In support of the motion, Academy relies on the Verified Complaint and the exhibits thereto.

Academy requests expedited consideration of this motion, consistent with Local Civil Rule 65.1(c) & (d),  so that the Court can issue a ruling as soon as practicable, but in no event later than June 14, 2020, when performance is scheduled to begin under Task Order 3.

Academy also requests that the Court consolidate the preliminary-injunction proceedings with a determination on the merits, as permitted by FED. R. CIV. P. 65(a)(2).

The grounds for this motion are set forth in the accompanying memorandum.  A proposed Order is provided.  Plaintiff requests a hearing on this motion.

<u>Local Civil Rule 7(m) Certification</u>

Before filing this motion, undersigned counsel communicated in good faith with WMATA attorney Jon B. Crocker, Esq. on May 15, 20, and 21, 2020, to determine whether WMATA would oppose it and if areas of disagreement could be narrowed.  The parties did succeed in narrowing the areas of disagreement, but WMATA's consent could not be obtained for the relief sought by this motion.

Date:  May 22, 2020

Respectfully submitted,

*/s/ Daniel I. Prywes*
Daniel I. Prywes (D.C. Bar No. 342394)
Andrew Mohr (D.C. Bar No. 334292)
MORRIS, MANNING & MARTIN, LLP
1401 Eye Street, NW, Suite 600
Washington, D.C.  20005
Phone: (202) 971-4182
Fax:    (202) 408-5146
dprywes@mmmlaw.com
amohr@mmmlaw.com

*Attorneys for Plaintiff*
*Academy Express, LLC*

Of Counsel:

C. Kelly Kroll, Esq.
Christos Christodoulou, Esq.
MORRIS, MANNING & MARTIN, LLP
1401 Eye Street, NW, Suite 600
Washington, D.C.  20005

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2020, I caused the foregoing to be served upon the

following by electronic mail, by first-class mail (postage prepaid), and by attempting hand delivery

upon:

> Office of General Counsel
> Attn:  Jon Crocker, Esq.
> WMATA
> 600 Fifth Street, NW
> Washington, DC   20001
>
> *Attorney for Defendant WMATA*

> */s/ Daniel I. Prywes*
> Daniel I. Prywes

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ACADEMY EXPRESS, LLC,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 1:20-cv-01374** |
| **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,** | |
| **Defendant.** | |

**PROPOSED PRELIMINARY INJUNCTION ORDER**

Upon consideration of the Verified Complaint of Plaintiff Academy Express, LLC ("Academy") and the exhibits thereto, Academy's motion for a preliminary injunction, the Opposition thereto of Defendant Washington Metropolitan Area Transit Authority ("WMATA"), and the entire record of these proceedings;

IT IS HEREBY ORDERED:

1. Defendant WMATA is ordered to suspend or cancel TMS's performance of Task Order 1 of Contract C20088C for Bus Bridge Services, and to award to Academy the work under that Task Order, until such time as the Court enters a final ruling in this suit.

2. Defendant WMATA is ordered not to award any additional Task Orders to TMS (including but not limited to Task Order 3) until such time as the Court enters a final ruling in this suit.

3. The Court finds that Academy will suffer irreparable injury unless this preliminary injunction is issued, in that Academy will not have a remedy for money damages.

4. Academy shall not be required to post a bond respecting the issuance of this preliminary

injunction.

SO ORDERED THIS __ DAY OF _____, 2020:

_____

U.S. District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ACADEMY EXPRESS, LLC,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 1:20-cv-01374** |
| **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,** | |
| **Defendant.** | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff Academy Express, LLC (hereinafter "Academy") submits this memorandum in support of its motion for a preliminary injunction against Defendant Washington Metropolitan Area Transit Authority ("WMATA").

## INTRODUCTION

WMATA issued a solicitation in November 2019 for "bus bridge services," under which Offerors would provide bus services to WMATA Metrorail passengers during periods when certain Metrorail routes or stations would be unavailable due to construction work.

WMATA's Request for Proposals ("RFP") stated that, to be eligible for award, each Offeror "shall demonstrate its licensing and other documentation demonstrating its legal authority to operate in the State of Maryland, the Commonwealth of Virginia, and the District of Columbia" (hereinafter the "WMATA service region").   (Complaint Ex. 2, at 15-16) (emphasis added.) Offerors also had to demonstrate "[p]roof of legal authority to operate as a transportation provider in WMATA's service area."   (Id. at 17.)   Further, Offerors were required to have "facilities" at which buses could be inspected.   (Id., at 19.)

Academy met these and other requirements of the RFP, and was selected by WMATA on

February 3, 2020, as eligible for future awards of Task Orders that would be subject to further bidding competition based on price.  Academy was not awarded any Task Orders at that time, and was not informed who else WMATA had selected as eligible for future Task Order awards.

On April 21, 2020, WMATA awarded two Task Orders to Transportation Management Services, Inc. ("TMS") for substantial work under the procurement, including Task Order 1 in the amount of $11,350,830.50.   TMS, however, itself had no legal authority to operate as a transportation provider in WMATA's service region and had no buses or facilities.  Instead, TMS relies entirely on subcontractors (one of whom is Academy) who have bus operating authority and facilities to perform the contract.

Academy promptly filed a protest with WMATA under WMATA's internal procurement procedures.  Academy argued that TMS failed to meet the requirements that it have operating authority and bus facilities within the WMATA service region, and therefore was a "nonresponsive" bidder that should not have been awarded the work.  WMATA denied the protest on May 7, 2020.

Academy has filed this suit to challenge WMATA's actions, as permitted under applicable law discussed below.  The issue of TMS's non-responsiveness is straightforward and there are no disputed facts.  Academy should be awarded preliminary and permanent injunctive relief that (a) would allow it to take over as soon as practicable the work wrongly awarded on Task 1 to TMS, a non-responsive bidder, and (b) would bar WMATA from future awards of Task Orders to TMS. All the elements for such injunctive relief are met.

Academy has a strong likelihood of success on the merits.  As a matter of law, the WMATA RFP did not allow a bidder to receive Task Orders if it had no operating authority or facilities of its own within the WMATA service region.

Academy also has suffered and will continue to suffer irreparable harm because it has no damages remedy for the lost revenue and profits it will suffer by WMATA's wrongful award of all of Task 1 to TMS.   Academy believes that it was next in line for award for Task 1.

The balance of the equities favors Academy.  It has been fully capable of taking over Task 1 on May 23, 2020 (when contract performance is to begin) and is ready to do so promptly afterwards.   Academy has a large bus fleet and has provided similar bus bridge services to WMATA previously.

Finally, courts have recognized that there is a strong public interest in maintaining the integrity and fairness of the public procurement process.  That public interest applies here since WMATA awarded work to an ineligible bidder.

For all these reasons, the Court should grant the preliminary injunctive relief sought by Academy, as well as permanent injunctive relief.  Academy requests that the Court consolidate the preliminary-injunction proceedings with a determination of the merits, as permitted by Rule 65(a)(2).  That is appropriate here because the undisputed facts show that TMS was not a "responsive" Offeror and was not eligible for any award of Task Orders.

## **Factual Background**

*The parties*.  Academy is a limited liability company organized under New Jersey law, with its principal place of business in Hoboken, New Jersey.  It is authorized to provide bus services in the WMATA service region.  Academy operates fleets of buses in interstate commerce, and also rents buses on a charter basis.   (Complaint ¶ 3.)

WMATA provides bus and Metrorail services to the public in the District of Columbia, Maryland, and Virginia. It was formed by Congress through an interstate compact (the "WMATA Compact"), which was adopted by the states of Maryland and Virginia and by the District of

Columbia.  *See* Pub. L. No. 89–774, 80 Stat. 1324 (1966);[1] D.C. CODE § 9–1107.01; MD. CODE
ANN., TRANSP. § 10–204 (West 2015); VA. CODE ANN. § 33.2–3100 (West 2015).

In the past, Academy has served as a WMATA contractor and has provided bus "bridge"
services for passengers while construction was underway on Metrorail routes and stations.
(Complaint ¶ 33.)

*The WMATA RFP*.  On November 19, 2019, WMATA issued its RFP for "Bus Bridge
Services" within the region, under which vendors would operate bus services to carry passengers
while construction work was planned to be underway in 2020 and afterwards.   (Complaint ¶ 8;
Complaint Ex. 2.)

WMATA'S RFP stated in several ways that "Offerors" were required to have operating
authority and facilities to provide the bus bridge services.  In service requirement 1.2, WMATA
stated:

> Offeror shall demonstrate <u>its</u> licensing and other documentation
> demonstrating <u>its</u> legal authority to operate in the State of Maryland, the
> Commonwealth of Virginia, and the District of Columbia.

(Complaint Ex. 2, at 15-16) (emphasis added.)

The term "Offeror" is defined in the RFP as "[a] party submitting a proposal in response
to this solicitation."  (Complaint Ex. 2, at 197.)  The term "Offeror" is to be distinguished from the
defined term "Contractor," with the latter defined as the entity that is "Contractually obligated" to
furnish service "through itself <u>or others</u>."   (<u>Id</u>., at 194) (emphasis added.)

Among other evaluation factors, the RFP required that an Offeror provide proof of its legal
authority to operate as a bus transportation service in the Washington metropolitan area:

---

[1]      Pub. L. 89-774 is available at:  https://www.govinfo.gov/content/pkg/STATUTE-80/pdf/STATUTE-80-Pg1324.pdf.  The WMATA Compact, as amended, can be found at: https://www.wmata.com/about/board/upload/Compact_Annotated_2009_final.pdf.

**Evaluation Factors:**

(1)     Proof of legal authority to operate as a transportation provider in WMATA's service area of State of Maryland, the Commonwealth of Virginia, and the District of Columbia.

(Complaint Ex. 2, at 17.)  Certificates of Authority for private carriers to provide bus services for WMATA are issued by the Washington Metropolitan Area Transit Commission ("WMATC"). WMATA Compact, § 56(b)(3).  Academy has such a Certificate.  (Complaint Ex. 1.)

The RFP also stated that, to verify that the Offeror's facilities met the RFP's requirements, WMATA's evaluation team will conduct a site survey of the Offeror's facilities:

6.     **<u>Site Visits:</u>**

6.1     The Technical Evaluation Team shall visit <u>Offeror's facilities</u> and inspect buses to be used for this Bus Bridge Service Contract and verify that necessary equipment, supplies, etc. are readily available.

(Complaint Ex. 2, at 19) (emphasis added.)  Similarly, the RFP states:

A successful <u>Offeror shall maintain sufficient facilities</u> that will allow it to adequately perform Contract as specified herein. WMATA shall make visits prior to Contract award to examine the <u>Offeror's facilities</u>.  This will include inspection of buses to be used for this Bus Bridge Service Contract and also to verify that necessary equipment, supplies, etc. are readily available.

(Complaint Ex. 2, at 22) (emphasis added).

The RFP added:

**In order for an Offeror's Technical Proposal to be deemed acceptable for Award, Contractor's proposal shall meet all the Evaluation criteria listed.**

(Complaint Ex. 2, ¶ 18, Technical Proposal Evaluation, at 21) (emphasis in original).  Thus, Offerors who did not have legal authority to operate as a transportation provider in the Washington, DC metropolitan area, and/or those without bus facilities in that area, were not eligible for award.

The gist of these requirements is that an <u>Offeror</u> had to be more than just a broker who connected WMATA and subcontractors, even though subcontracting by a qualified "Offeror" is

5

permitted.  (Complaint Ex. 2, at 73-74.)  The Offeror had to have real operating-authority and real facilities.

By letter dated February 3, 2020, WMATA informed Academy that it was making an IDIQ award to WMATA for "$0.00," and that Academy could compete for future Task Orders to be issued under that IDIQ selection.  (Complaint Ex. 4.)  WMATA stated that future Task Orders would be awarded and issued to "Contractor(s) based on availability of buses, bus operators, supervisors, top management, and lowest priced."  (Id.)

At the time, in February 2020, WMATA did not inform Academy of the names of other bidders who had been found eligible for IDIQ awards, and thus eligible to compete for Task Orders under the same procurement.  (Complaint ¶ 18 & Ex. 4.)

*Task Orders 1 and 2*.  On March 13, 2020, WMATA issued solicitations for Task 1 and Task 2 under the procurement.  (Complaint ¶ 17.)  Task 1 solicited bus bridge service between certain Metrorail stations for the period between May 23 and September 9, 2020, with approximately 120,000 hours of services.  (Complaint Ex. 5.)  Task 2 solicited bus bridge service between other Metrorail stations for the period between May 25 and September 9, 2020, with over 60,000 hours of service.  (Complaint Ex. 6.)  Academy timely submitted proposals in response to Task 1 and Task 2.  (Complaint ¶ 17.)

On April 21, 2020, WMATA sent letters to Academy advising that its price proposals for Task 1 and Task 2 were "not the lowest priced."  (Complaint ¶ 18 & Exs. 7, 8.)  Consequently, Academy was not offered those Task Orders.  Academy learned that same day that TMS had been awarded both Task Orders.  (Complaint ¶ 18.)  Previously, Academy did not know that TMS had been selected for IDIQ awards under the procurement making TMS eligible to bid on Task Orders. (Id.)

*Academy's Bid Protest to the WMATA Contracting Officer.*  On April 20, 2020, Academy submitted a bid protest to WMATA's contracting officer pursuant to the protest procedure described in Section 17-3 of WMATA's Procurement Procedures Manual ("WMATA PPM").[2] (Complaint ¶ 19.)  The protest claimed that TMS failed to meet the mandatory RFP requirements that Offerors have operating authority and facilities of their own.  (Complaint Ex. 9.)

With the protest, Academy presented an email from WMATC stating that there was no record that TMS had operating authority from WMATC.  (Complaint Ex. 9, at 5.)

Academy also checked TMS's website, which states:

> <u>TMS is not a bus company and we do not own any vehicles, nor do we directly hire drivers</u>. We have an international database of 2,000+ fleet partners and utilize data provided by the Federal Motor Carrier Safety Administration (FMCSA) as one point of a service indicator to assess the fitness of a carrier. . . . We guarantee that we will utilize the best equipment available in each market and that all vehicles used will be provided to TMS through licensed, insured, and reputable <u>subcontractors</u>.

https://www.tms.com/operational-approach/ (emphasis added) (Complaint Ex. 12.)

On May 7, 2020, WMATA's contracting officer sent Academy a letter denying the bid protest.  (Complaint Ex. 10.)  That letter informed Academy that it could "pursue any appeal of this decision" by filing suit in this Court, which has "original jurisdiction concerning WMATA protest decisions."  (<u>Id</u>., at 2.)

WMATA's denial of the protest was "based primarily" on its citation to a WMATA answer on December 4, 2019, during the solicitation process, to a question asking whether a bidder could rely entirely on subcontractors:

> Q5. On page 17 of the RFP, Evaluation Factor (1) requires proof of legal authority to operate as a transportation provider in WMATA's service area of State of

---

[2]     The WMATA PPM is available at:
https://www.wmata.com/business/procurement/upload/WMATA-Procurement-Procedures-Manual-2017-Version-7-9.pdf.

Maryland, the Commonwealth of Virginia and the District of Columbia. There is no reference in the RFP that offeror is required to operate under FMCSA DOT Operating Authority. <u>Will bids be accepted by WMATA Vendors who do not have a DOT number but subcontract with compliant bus operators</u>?

A5. <u>WMATA will accept proposals that conform to the solicitation and meets all evaluation criteria of the solicitation</u>.

(Complaint Ex. 10, at 2; Complaint Ex. 3) (emphasis added.)

WMATA reasoned that this answer informed bidders that the "awarded firm does not have to hold ownership of the transportation used," as long as the "subcontractors . . . are compliant." (Complaint Ex. 10, at 2.)  In actuality, the WMATA answer said no such thing.  Instead, the answer reaffirmed that proposals had to meet "all evaluation criteria," which would include the requirements that Offerors be licensed to operate within the WMATA service region and that they have facilities at which buses could be inspected.[3]  (<u>Id</u>.)

As a secondary ground for denial, WMATA asserted that Academy's bid protest was untimely because it was not filed within seven days of WMATA's selection in February 2020 of TMS as a qualified Offeror under the IDIQ procurement, as allegedly required by WMATA's procurement rules.[4]  (Complaint Ex. 9.)  However, WMATA did not explain how Academy should

---

[3]     The question also dealt with "FMCSA DOT Operating Authority" from the Federal Motor Carrier Safety Administration, not with the required operating authority from WMATC. WMATA Compact § 56(b)(3).  *See* note 7, *infra*.

[4]     WMATA relied on Section 17-3(c-d) of its Procurement Procedures Manual (at 256), which provides as follows:

(c) Protest Regarding Award of a Contract. • Any protest regarding the award on a contract must be filed no later than seven days after the date of award. Any protest regarding the award of a contract filed after that date will not be considered by the Authority. • This type of protest will only be considered by the Authority if the protestor is able to demonstrate that the party awarded the contract fraudulently represented itself as a responsible bidder or proposer or that the Authority violated Federal law or the Authority's Compact in the award of the contract.

(d) Untimely Protests. • Initial protest submissions received by the Authority after

have known of the zero-dollar award to TMS, why that zero-dollar award would even be considered a "contract," or why Academy would have had an economic interest in protesting that award to TMS when it had no dollar value on its own.

On May 8, 2020, WMATA informed Academy of the dollar value of the winning bids:

Task 1:          $11,350,830.50
Task 2:          $5,965,455.00

(Complaint ¶ 18; Complaint Ex. 13.)

After communications with WMATA's counsel, on May 18, 2020, Academy filed a request for WMATA to reconsider its denial of Academy's protest.  Academy has not yet received a response, though one was expected earlier this week based on the parties' communications.¶

*Contract Performance to Begin on May 23, 2020*.  Under Task Order 1, TMS is scheduled to begin providing bus service for WMATA riders on May 23, 2020.  (Complaint ¶ 17.)

*Task Order 3*.  On May 12, 2020, WMATA issued a request for bids to perform Task Order 3, under which contract performance is to begin on June 14, 2020 and continue through September 8, 2020.  (Complaint Ex. 11.)  Academy expects that TMS will bid for that work as well. (Complaint ¶ 21.)  The work under Task 3 will be substantial, including 31,672 hours of bus bridge shuttle service, 24,648 hours of shuttle supervisor services, and 10,114.50 hours of supplemental ADA services.  (Complaint Ex. 11.)

## ARGUMENT

### I.     The Legal Principles Governing this Bid Protest

Congress has granted this Court subject-matter jurisdiction over all suits brought against

the time periods specified above shall be deemed by the Contracting Officer to be untimely and may be denied.

https://www.wmata.com/business/procurement/upload/WMATA-Procurement-Procedures-Manual-2017-Version-7-9.pdf

WMATA.  D.C. Code § 9-1107.10; WMATA Compact § 81.  (*See* note 1, *supra;* Complaint Ex. 2, at 28.)  This authority has been construed to include jurisdiction of bid protests brought by unsuccessful bidders on WMATA contract solicitations.  Challenger Transportation, Inc. v. WMATA, Civ. No. TDC-14-3322, 2016 WL 245245, at *4 (D. Md. Jan. 21, 2016) ("Challenger II"); Monument Realty LLC v. WMATA, 540 F. Supp. 2d 66, 76 (D.D.C. 2008); Seal & Co. v. WMATA, 768 F. Supp. 1150, 1152, 1156 (E.D. Va. 1991).

Section 73 of the WMATA Compact addresses WMATA's contracting and purchasing authority.  Subject to limited exceptions, WMATA must "obtain full and open competition through the use of competitive procedures" when procuring goods and services.  WMATA Compact § 73(a)(1)(A).  WMATA must adopt contracting and purchasing policies and procedures.  Id. § 73(g).  Those policies are contained in WMATA's PPM.  *See* Challenger Transportation, Inc. v. WMATA, Civ. No. TDC-14-3322, 2015 WL 4608060, at *4 (D. Md. July 30, 2015) ("Challenger I"); note 2, *supra*; WMATA PPM § 3-6, at 63.

Federal courts "have recognized a cause of action for a disappointed offeror to challenge a WMATA contract award, analogous to a challenge to a federal agency's procurement decision, under a standard comparable to that applied under the Administrative Procedure Act ['APA']."[5] Challenger II, at *4.  Accordingly, WMATA procurement decisions may not be based on "arbitrary and capricious violations of the statutes and regulations governing the awards of federal contracts." Monument Realty, 540 F. Supp. 2d at 76. *See* Elcon Enters. v. WMATA, 977 F.2d 1472, 1479–80 (D.C. Cir. 1992).  A bid-protest plaintiff should demonstrate that an award had "no rational basis," or that the process by which it was reached "involved a clear and prejudicial violation of applicable

---

[5]     Under the APA, a plaintiff must show that the administrative decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) & (D).

statutes or regulations." <u>Monument Realty</u>, 540 F. Supp. 2d at 76 (*quoting* <u>Elcon Enters.</u>, 977 F.2d at 1479–80).

A court's review of a bid protest against WMATA is a two-step process. "First, the court determines if the agency violated applicable procurement law or otherwise acted without a rational basis. . . . It then decides if the agency's action caused significant prejudice to the offeror." <u>Challenger II</u>, 2016 WL 245245, at *4 (quotations omitted). "To establish significant prejudice, an offeror 'must show that there was a substantial chance it would have received the contract award but for' the alleged error in the procurement process." <u>Id.</u>, at *5. *See* <u>Monument Realty</u>, 540 F. Supp. 2d at 77.

One fundamental rule of government contracts is that "[a]gencies must reject nonresponsive bids." <u>Monument Realty</u>, 540 F. Supp. 2d at 77. "Bid responsiveness determinations focus on whether a bidder has unequivocally offered to perform, without exception, '<u>the exact thing called for in a solicitation</u> so that acceptance of the bid will bind the contractor to perform in accordance with all of the IFB's material terms and conditions.'" <u>Id.</u> (citations omitted) (emphasis added).[6] *See* <u>Controlled Power Ltd. P'ship v. WMATA</u>, Civ. No. 91-0674, 1991 WL 155792, at *3 (D.D.C. July 31, 1991).

## II.    The Court Should Grant a Preliminary Injunction

This Court should issue a preliminary injunction if Academy shows that it (1) is likely to succeed on the merits; (2) will suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities weighs in its favor; and (4) an injunction would be in the public interest. <u>Wise v. United States</u>, 128 F. Supp. 3d 311, 316 (D.D.C. 2015). These "four factors have typically

---

[6]    As the Court explained in <u>Monument Realty</u>, the "responsiveness" requirement aims to ensure that bidders "stand on an equal footing and [thus] maintain the integrity of the sealed bidding system." 540 F. Supp. 2d at 77 (citation omitted).

been evaluated on a sliding scale."  Id. (citing Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291 (D.C. Cir. 2009)).  "[W]here the plaintiff" makes an "usually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." Id.

All four factors favor Academy.

*Likelihood of success*.  To show a likelihood of success in challenging WMATA's contract award, Academy must establish two elements.  First, it must show there was either "no rational basis" for the contract award, or the process was a "clear and prejudicial violation of applicable statutes and regulations."  Monument Realty, 540 F. Supp. 2d at 76.  That is the case here. WMATA awarded Task 1 to TMS as the "Offeror" even though TMS was not licensed to operate buses for WMATA in WMATA's service region, and it had no facilities where buses could be inspected, as required by the RFP.  TMS's proposal was not "responsive" to the solicitation because it did not provide "exactly" what was required of it as an "Offeror" (the party submitting the proposal).  Id. at 77.

WMATA's answer to Question No. 5 about subcontracting does not support the "primary" basis for its denial of Academy's protest.  That answer reaffirmed that all bidders had to "conform to the solicitation and meets all evaluation criteria of the solicitation" (Complaint Ex. 10, at 2; Complaint Ex. 3) which included the requirement that Offerors have their own operating authority and facilities.[7]  (*See* pp. 7-8, *supra*.)   Further, WMATA did not issue any

---

[7]     Furthermore, Question No. 5 dealt with operating authority under the Federal Motor Carrier Safety Administration ("FMCSA"), not with WMATC authority.  The Answer to Question No. 2 made clear that operating authority was needed under WMATC for the provision of buses to WMATA:

> WMATA requires that carriers comply with all federal, state and local
> requirements regarding operation of motor coaches.  FMCSA and WMATC
> service different purposes and have applicability specific to their regulatory

formal amendment to the RFP withdrawing the requirement that the Offeror have the authority to operate and facilities to support the service.

Second, to succeed, Academy must have suffered significant prejudice from the errors in the procurement process, and it can do that by showing that it would have had a "substantial chance" of receiving Task 1 if WMATA had not wrongly awarded them to TMS.  *See* Monument Realty, 540 F. Supp. 2d at 77.  Academy meets that requirement if, as it reasonably believes it would have been "next in line" for award of Task 1.  Id.  Academy's bid was only slightly higher than the amount awarded to TMS (according to WMATA's email communication in Exhibit 13).[8] (Complaint ¶ 18.)

WMATA's contracting officer denied Academy's bid protest on the secondary ground that it was untimely and should have been filed within seven days of WMATA's selection of IDIQ awardees on or about February 3, 2020.  (Complaint Ex. 10, at 2.)  WMATA relied on Section 17-3(c-d) of its PPM.   (*See* note 4, *supra*.)  That contention is wrong for several reasons.

First, Academy was not informed prior to April 21, 2020 that TMS was one of the IDIQ awardees or that TMS lacked operating authority in the WMATA service region.   (Complaint ¶ 18; Complaint Ex. 8.)  Thus, prior to April 21, 2020, Academy lacked the necessary information to file a protest about TMS's lack of responsiveness.  Under federal procurement law, protests are generally not ripe until "after the basis of protest is known or should have been known, whichever is earlier."  Federal Acquisition Regulation, 48 C.F.R. § 33.103(e).  The WMATA PPM has no

---

mandate.  WMATA expects that all bidders and selected contractors will fulfill regulatory obligations as are applicable to the services rendered.

(Complaint Ex. 3, Question and Answer No. 2.)  TMS does not hold WMATC authority.

[8]     Academy is not asserting claims relating to the award of Task Order 2 to TMS, though Academy believes that TMS was also not eligible for that award.

inconsistent provision, and if it did that would violate due-process requirements.

Second, WMATA's position is not supported by Section 17-3(c) the WMATA PPM. That section provides: "Any protest regarding the award on a <u>contract</u> must be filed no later than seven days after the date of award." (Emphasis added.) That language does not apply because, under WMATA's own procedures, the zero-dollar awards to Academy (and presumably TMS) did not constitute a contract. The awards had no minimum value, involved no consideration to the bidders who were not bound to bid on any task orders, and were not based on price competition which was to occur only at the task-order bidding stage.[9] The PPM requires the award of an IDIQ contract to include a minimum dollar amount to bind the parties. WMATA PPM § 4-13(a).[10] Here, the award amount in February 2020 was $0.00 and thus did not result in the award of a binding contract. There was no "contract" in February 2020 for Academy to protest.

Third, at the time that the IDIQ contracts were awarded in February 2020, Academy had suffered no injury because no Task Orders had been awarded then. (Complaint Ex. 3.) Its standing to protest, or sue, would have been in doubt.

Under all these circumstances, WMATA's finding that Academy's protest was untimely

---

[9]    WMATA's RFP stated that "pricing will be determined at the Task Order level," with "[s]econdary competition" for "each Task Order." (Complaint Ex. 2, at 20.)

[10]    PPM § 4-13 states that: "For each contractor receiving an award under a single solicitation, the contract must require the Authority to order, and the contractor to furnish, at least <u>a stated minimum dollar amount</u> of supplies or services." (Emphasis added.) Similarly, under federal procurement law, "to provide adequate consideration for a binding IDIQ contract, an agency must establish a guaranteed minimum that is more than a nominal amount and reflects the amount the agency is fairly certain to order." <u>Decision Matter of: Library of Cong.-Obligation of Guaranteed Minimums for Indefinite-Delivery, Indefinite-Quantity Contracts Under the Fedlink Program (Library)</u>, B-318046, 2009 WL 1978719, at *1 (Comp. Gen. July 7, 2009).

violated the requirement that WMATA use "full and open competition through the use of competitive procedures." WMATA Compact § 73(a)(1)(A). If WMATA's position were accepted, it would effectively bar later protests where the bidders were unaware of who else was initially selected for zero-dollar awards that were not based on any price competition.

*Irreparable harm*. Academy will suffer irreparable harm in the absence of preliminary relief. To establish irreparable harm, Academy must show that "irreparable injury is *likely* in absence of an injunction and not a mere possibility." Wise, 128 F. Supp. 3d at 319-20 (quotations omitted and emphasis in original) (*citing* Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)). Academy's injury is actual and imminent for two reasons.

First, in the absence of the requested relief, the improperly awarded party (TMS) will begin and continue performance on Task 1, and Academy will be deprived of the sizeable revenues on a Task Order worth over $11 million. (Complaint ¶¶ 17, 21, 32.)

Second, absent an injunction, WMATA may award additional Task Orders to TMS (such as Task Order 3, which is now being competed for) even though TMS is not a responsive bidder due to its lack of operating authority and facilities. (Complaint ¶¶ 21, 31.)

Academy's injury is also irreparable because Academy will not have an adequate damages remedy in the absence of an injunction. Sterling Commercial Credit--Michigan, LLC v. Phoenix Indus. I, LLC, 762 F. Supp. 2d 8, 16 (D.D.C. 2011) (irreparable harm exists where "a plaintiff's alleged damages are unrecoverable").[11] The APA does not provide a damages remedy upon a

---

[11]  Clarke v. Office of Fed. Hous. Enter. Oversight, 355 F. Supp. 2d 56, 66 (D.D.C. 2004) (granting injunctive relief because "losses resulting from [the plaintiff's] inability to exercise rights to restrict stock and stock options will likely be unrecoverable"). *See* Georgia Vocational Rehab. Agency Bus. Enter. Program v. United States, 354 F. Supp. 3d 690, 700 (E.D. Va. 2018) (granting temporary restraining order where the plaintiffs would suffer irreparable harm because they could not recover damages for loss of profits even if successful in their arbitration).

successful protest.[12]   (*See* WMATA PPM, § 17-7, at 258.)  Nor has Academy's counsel found any precedent for a damages award in a successful protest of a WMATA procurement.  Under statutes other than the APA, bidders on federal contracts are not allowed to recover lost profits on contracts wrongfully awarded to others, but can only recover bid-preparation costs.  *E.g.*, Eco Tour Adventures, Inc. v. Jewell, 174 F. Supp. 3d 319, 328 (D.D.C. 2016).

*Balance of hardships*.  Courts will "balance the relative harm each party would face if an injunction were granted."  Monument Realty, 540 F. Supp. 2d at 80.  Here, the balance of equities weighs in Academy's favor.

Academy will lose substantial revenues if it is not permitted to take over performance of all of Task 1.  In contrast, WMATA will suffer little or no harm because it can readily substitute Academy for TMS on May 23, 2020 (when contract performance is to begin), or as soon afterwards as practicable.  WMATA can do so because Academy was selected for an IDIQ award, making it eligible to provide services, and Academy is ready, willing, and able to fulfill Task 1 in its entirety beginning as soon as May 23, 2020 as well as afterwards.  (Complaint ¶ 33.)   Academy has performed such work for WMATA in prior years.  (Id.)  Any inconvenience to WMATA resulting from a substitution of Academy for TMS is the product of WMATA's improper award and not any fault of Academy.

An injunction should issue even though Academy is seeking a change in the *status quo* by requiring WMATA to cancel the award of Task 1 to TMS and to substitute Academy in its place.

---

[12]      Courts have found irreparable harm and issued injunctive relief when, in the absence of such relief, the plaintiff would "lose the opportunity to earn the profit it would have made under th[e] contract" and "to compete for a contract on a level playing field."  Hosp. Klean of Tex, Inc. v. United States, 65 Fed. Cl. 618, 624 (2005) (citing cases).  *See, e.g.*, Georgia Vocational Rehab. Agency Bus. Enter. Program v. United States, 354 F. Supp. 3d 690, 700 (E.D. Va. 2018) (granting temporary restraining order where the plaintiffs would suffer irreparable harm because they could not recover damages for loss of profits even if successful in their arbitration).

Although such injunctions should be issued "sparingly," they are appropriate where the four factors weigh strongly in favor of injunctive relief.  Ctr. for Pub. Integrity v. United States Dep't of Def., 411 F. Supp. 3d 5, 10 (D.D.C. 2019).  That is the case here.  Courts have issued injunctions requiring government agencies to cancel improperly awarded contracts and to award them to successful protestors.[13]  WMATA itself has the authority to do so.  WMATA PPM, § 17-7(c), at 258.

*The public interest*.  The public interest weighs in Academy's favor.  The public has an interest in "preserving the fairness and integrity of the government's procurement systems." Monument, 540 F. Supp. 2d at 81.[14]  That interest will be vindicated by the award of injunctive relief.  Moreover, Academy has the necessary equipment, facilities and employees to replace TMS subcontractors in the performance of Task 1 contract award without delay, thereby protecting the public interest.

---

[13]    *E.g.,* Virgin Islands Paving, Inc. v. United States, 103 Fed. Cl. 292, 307 (2012) (enjoining contract award and "instruct[ing agency] to take appropriate measures, which may include re-competing the Contract"); United Payors & United Providers Health Servs., Inc. v. United States, 55 Fed. Cl. 323, 324 (2003) (granting injunctive relief requiring HHS to terminate contract and permanently enjoining HHS from proceeding with any contract under the HHS solicitation, but allowing the Government to resolicit bids for services); Mack Trucks, Inc. v. United States, 6 Cl. Ct. 68, 73 (1984) (permanently enjoining U.S. Postal Service "from rejecting the bid submitted by plaintiff . . ., and from awarding the contract which is the subject of the IFB to any source other than [plaintiff].").

[14]    *See* Scanwell Lab., Inc. v. Shaffer, 424 F.2d 859, 864 (D.C. Cir. 1970) ("[T]hose injured by the arbitrary or capricious action of a government agency or official in ignoring [applicable] procedures can vindicate their very real interests, while at the same time furthering the public interest" because "the suit itself is brought in the public interest by one acting essentially as a 'private attorney general.'"); CW Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559, 576 (Fed. Cl. 2004) ("There is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations."), *clarified*, 63 Fed. Cl. 459 (Fed. Cl. 2005).

## **CONCLUSION**

For the foregoing reasons, the Court should grant the motion for a preliminary injunction.


Date:  May 22, 2020

Respectfully submitted,


*/s/ Daniel I. Prywes*

Daniel I. Prywes (D.C. Bar No. 342394)
Andrew Mohr (D.C. Bar No. 334292)
MORRIS, MANNING & MARTIN, LLP
1401 Eye Street, NW, Suite 600
Washington, D.C.  20005
Phone: (202) 971-4182
Fax:    (202) 408-5146
dprywes@mmmlaw.com
amohr@mmmlaw.com

*Attorneys for Plaintiff*
*Academy Express, LLC*


Of Counsel:

C. Kelly Kroll, Esq.
Christos Christodoulou, Esq.
MORRIS, MANNING & MARTIN, LLP
1401 Eye Street, NW, Suite 600
Washington, D.C.  20005

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 22, 2020, I caused the foregoing to be served upon the following by electronic mail, first-class mail (postage prepaid), and by attempting hand delivery upon:

Office of General Counsel
Attn:  Jon B. Crocker, Esq.
WMATA
600 Fifth Street, NW
Washington, DC   20001

*Attorney for Defendant WMATA*

<u>*/s/Daniel I. Prywes*</u>
Daniel I. Prywes