UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| ACADEMY EXPRESS, LLC, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 20-1374 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 3, 11 |
| | : | | |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION; GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE

### I. INTRODUCTION

This case involves Plaintiff Academy Express, LLC's ("Academy") challenge to Defendant Washington Metropolitan Area Transit Authority's ("WMATA") award of contracts to provide bus transportation. WMATA recently awarded contracts to Transportation Management Services, Inc. ("TMS"), an Intervenor-Defendant in this case, to supply bus transportation services between Metrorail stations that are or will be closed during necessary construction projects. Academy alleges that TMS should not have been awarded the contracts because, according to Academy, TMS does not meet the technical requirements outlined in the Request for Proposal ("RFP") issued by WMATA. Specifically, Academy argues that because TMS does not actually own any buses, and instead works with subcontractors, its proposal should have been denied by WMATA as a nonresponsive bid. Alongside its Complaint, ECF No. 1, Academy filed a motion for preliminary injunction, *see* Pl.'s Mot. Prelim. Inj., ECF No. 2. Also before the Court is Academy's motion to file two supplemental declarations in support of

its motion for preliminary injunction.  *See* Pl.'s Mot. for Leave to File, ECF No. 11.  Having considered the parties' briefing and oral arguments, and for the reasons set forth below, the Court grants Academy leave to file supplemental declarations and denies Academy's motion for preliminary injunction.

## II.  FACTUAL BACKGROUND

WMATA announced the RFP at issue on November 19, 2019.  Compl. ¶ 8.  The RFP called for bus services on an Indefinite Delivery, Indefinite Quantity ("IDIQ") basis to take Metrorail passengers between stations during necessary construction.  *Id.*  Under the RFP, the contracts are awarded in a two-step process: first, WMATA determines awardees for the IDIQ contract without regard to pricing, then, it holds a secondary competition for particular task orders relevant to the overall project.  *Id.*; *see also* Compl. Ex. 2 at 6 ("RFP"), ECF No. 1-5.

The RFP outlines the evaluation criteria for the contract and states that WMATA "will award a Contract resulting from this solicitation to the responsible Offeror(s) whose proposal conforms to the solicitation and is determined to be the lowest priced among those proposals rated 'technically acceptable.'"  RFP at 15.  The document lays out the various requirements and provides the evaluation factors relevant to those requirements.  *Id.* at 15–20. Among the technical requirements, the RFP states that the "Offeror shall demonstrate its licensing and other documentation demonstrating its legal authority to operate in the State of Maryland, the Commonwealth of Virginia, and the District of Columbia."  *Id.* at 16.  The evaluation factor that appears under this requirement reads: "Proof of legal authority to operate as a transportation provider in WMATA's service area."  *Id.* at 17.  The RFP also notes that WMATA "shall visit Offeror's facilities and inspect buses to be used for [the project] and verify that necessary equipment, supplies, etc. are readily available."  *Id.* at 19.  "Only those proposal(s) as are deemed

acceptable in terms of their overall technical merit shall remain eligible for potential award." *Id.* at 20.  In a question answer document meant to clarify the requirements described in the RFP, WMATA responded to the question "[w]ill bids be accepted by WMATA Vendors who do not have a [Department of Transportation] number but subcontract with compliant bus operators?" Compl. Ex. 3 at 4–5, ECF No. 1-6.  In response, WMATA answered "WMATA will accept proposals that conform to the solicitation and meet[] all evaluation criteria of the solicitation." *Id.*  WMATA awarded Academy an IDIQ contract on February 3, 2020, making it eligible to bid on task orders.  Compl. ¶ 16.

On March 13, 2020, WMATA solicited bids for the first two task orders.  *Id.* ¶ 17.  A little over a month later, on April 21, WMATA notified Academy that it had not been selected for either of the first two task orders; Academy learned that TMS won the contracts instead.  *Id.* ¶ 18.  On April 23, Academy protested the award of the first two task orders.  *Id.* ¶ 19.  Academy argued that because TMS is not a licensed motor carrier and because it does not own any vehicles, its proposal for the IDIQ contract should never have been deemed technically acceptable.  *Id.*  On May 7, WMATA denied Academy's protest.  *Id.* ¶ 20.  WMATA stated that TMS was not required to hold ownership of the transportation and that it was authorized to subcontract the work.  *Id.*  WMATA also denied Academy's protest as untimely because it was not filed within seven days after WMATA awarded the IDIQ contracts in February 2020.  *Id.*  As of May 23, TMS began performing under the first two task orders.  *See* WMATA's Opp'n Mot. Prelim. Inj. at 5 ("WMATA's Opp'n"), ECF No. 9.  WMATA recently awarded the third task order to a different company not party to this litigation.  *Id.* at 6 n.4.

Citing the WMATA Compact and the Administrative Procedure Act ("APA"), Compl. ¶ 23, Academy requests preliminary injunctive relief "directing WMATA to suspend and terminate

the award of Task 1 to TMS and to substitute Academy in its place, and to bar WMATA from awarding additional task-order contracts to TMS." *Id.* ¶ 2.

### III.  LEGAL STANDARD

Preliminary injunction is an "extraordinary remedy." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  When considering an application for emergency injunctive relief, courts consider four factors: "(1) whether there is a substantial likelihood that plaintiff[] will succeed on the merits, (2) whether plaintiff[] will suffer irreparable injury absent an injunction, (3) whether an injunction would harm the defendants or other interested parties (the balance of harms), and (4) whether the public interest would be furthered by an injunction." *Monument Realty LLC v. Washington Metropolitan Area Transit Authority*, 540 F. Supp. 2d 66, 74 (D.D.C. 2008).  "[T]he plaintiff bears the burden of persuasion on all four preliminary injunction factors in order to secure such an extraordinary remedy." *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016) (internal quotations omitted).  Courts in this District have described the substantial likelihood of success on the merits factor as "particularly important" because without such a showing, "there would be no justification for the court's intrusion into the ordinary process of administration and judicial review." *Hubbard v. U.S.*, 496 F. Supp. 2d 194, 198 (D.D.C. 2007) (quoting *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 140 (D.D.C. 1999)).  "[A] failure to show a likelihood of success on the merits is sufficient to defeat a motion for a preliminary injunction." *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 99 (D.D.C. 2017), *aff'd*, 897 F.3d 314 (D.C. Cir. 2018) (citing *Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009) and *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006)).

## IV.  ANALYSIS

### A.  Cause of Action

As an initial matter, the Court observes that whether the APA applies to WMATA procurement decisions appears to be an open question in this Circuit.  Academy relies on *Monument*, a decision from this District that states "WMATA is treated as a federal agency for purposes of standing when a party seeks to challenge WMATA's procurement decisions in federal court" and that "WMATA's procurement decisions must be made in accordance with the APA and applicable federal law."  540 F. Supp. 2d at 76 (citing *Elcon Enters. v. WMATA*, 977 F.2d 1472, 1479–80 (D.C. Cir. 1992)).  However, *Elcon*, the D.C. Circuit decision cited in *Monument*, did not decide the issue.  The court there assumed, without deciding, that WMATA's "procurement decisions must be reached in accordance with the APA."  *Elcon*, 977 F.2d at 1480.  But the court emphasized the importance of the issue, stating that "if the APA does not apply, there is a serious question whether [the plaintiff] has a federal cause of action for judicial review of WMATA's procurement decisions."  *Id.* at 1479 n.2.  Clearly, if the APA does not provide a cause of action, Academy would not be entitled to any relief, let alone the extraordinary remedy of a preliminary injunction.  However, because the parties have not provided briefing on this issue, and because the Court finds Academy has not established a substantial likelihood of success on the merits under an APA review, the Court will also assume, without deciding, that the APA applies to WMATA procurement decisions.

### B.  Substantial Likelihood of Success on the Merits

Review of procurement decisions is "highly deferential."  *Leboef, Lamb, Greene & MacRae, LLP v. Abraham*, 347 F.3d 315, 320 (D.C. Cir. 2003) (citing *Multimax, Inc. v. Fed. Aviation Admin.*, 231 F.3d 882 (D.C. Cir. 2000)).  "[T]he disappointed bidder seeking to

5

overturn the agency's decision must show either that the agency's decision lacked a rational basis or that the 'procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.'" *Id.* (citing *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). Courts considering the language of a solicitation, like an RFP, consider the document as a whole in "a manner that harmonizes and gives reasonable meaning to all of its provisions." *Banknote Corp. of Am., Inc. v. U.S.*, 365 F.3d 1345, 1352 (Fed. Cir. 2004).

Academy's challenge boils down to interpretation of the RFP and whether WMATA's reading "lacked a rational basis" or "involved clear and prejudicial violation of applicable statutes or regulations." *Leboef*, 347 F.3d at 320. Academy insists that the language of the RFP requires that the "Offeror had to have real operating-authority and real facilities," Pl.'s Mot. at 6, or, in other words, the language of the RFP prohibits companies like TMS, that rely solely on subcontracting to acquire buses and drivers, from winning the contracts. Academy points to the use of the possessive pronoun "its" in the RFP to support its argument. *See* RFP at 16 ("Offeror shall demonstrate *its* licensing and other documentation demonstrating *its* legal authority to operate.") (emphasis added). Academy also points to a portion of the RFP about site inspections to support its argument that bidders must own real facilities. *See id.* at 19 (WMATA "shall visit *Offeror's* facilities and inspect buses to be used for [the project] and verify that necessary equipment, supplies, etc. are readily available.") (emphasis added). Academy reads into these possessive nouns an implicit prohibition against companies like TMS that rely solely on subcontracting to acquire buses and drivers. WMATA argues that nothing in the language of the RFP's evaluation criteria "contain[s] such a restrictive requirement." WMATA Opp'n at 14. Furthermore, WMATA and TMS point to portions of the RFP that specifically allow for subcontracting. *See* RFP at 142 ("Subcontracting – The Contractor may subcontract any of the

6

transportation services associated with the Contract, with WMATA approval, but will remain solely responsible for service performance and completion of all contract requirements . . . .").

The Court finds that Academy has not shown that WMATA's reading lacked a rational basis or was a clear and prejudicial violation of the law.  First, the language of the evaluation factors does not appear to prohibit a company like TMS from winning the contract.  The language requires that bidders demonstrate the necessary licensing and materials to perform the work; it does not dictate that bidders cannot use subcontractors to fulfill the technical specifications.  Second, when the RFP is considered as a whole, including the portions explicitly permitting subcontracting, WMATA's interpretation becomes all the more reasonable.  There is a rational basis for not reading a few possessive pronouns in a several hundred-page document as categorically barring companies like TMS, especially because the RFP contains no explicit prohibition of logistic companies like TMS and explicitly permits subcontracting.  Even if the Court disagreed with WMATA's reading, under the highly deferential standard required, it would uphold the procurement decision because its interpretation has a rational basis.

Academy primarily relies on *International Bank for Reconstruction and Development v. District of Columbia* in support of its textual argument.  171 F.3d 687 (D.C. Cir. 1999).  There, the court considered the language of the treaty that formed the World Bank.  The treaty confers tax immunity on the World Bank based on the language in the following provision: "The Bank, its assets, property, income and its operations and transactions authorized by this Agreement, shall be immune from all taxation and from all customs duties." *Id.* at 688.  The question for the court was whether this provision confers tax immunity on outside vendors providing food and beverage services within the World Bank's D.C. headquarters.  *Id.*  The court found it did not and stated "[w]e may not read international treaties so broadly as to create unintended benefits or

to reach parties not within the scope of a treaty's language." *Id.* at 691. While "'operations' and 'transactions' may have a broad sweep . . . the terms are qualified by the pronoun 'its,' which refers to the Bank." *Id.* Academy suggests this holding compels its reading of the RFP. The Court disagrees. First, the case here is different because the Court owes deference to WMATA's decision making under an APA review, and the Court believes WMATA's reading has a rational basis. Second, the court's worries in *International Bank* about creating unintended tax benefits to parties not present to a treaty—or any analogous worries—are not present here. Finally, the Court must read the RFP as a whole, and it is undisputed that the document explicitly contemplates and allows for subcontracting. It does not appear that the treaty analyzed in *International Bank* provided the same or similar context.

Although Academy points to some policy reasons why WMATA would want offerors to have their own licensing and facilities rather than rely on those of their subcontractors, *see* Pl.'s Reply at 4, ECF No. 12 ("[The RFP] required that an Offeror itself have real operating authority, and real facilities, so that it could undertake contract performance if necessary upon a subcontractor failure."), WMATA views this differently, *see* WMATA's Opp'n at 14–17 (explaining why WMATA believes TMS qualified for the award). Whether or not Academy's position makes for superior policy, which this Court does not decide, it is to WMATA's views of how it should conduct operations to which this Court owes deference. *See Wit Assocs., Inc. v. United States*, 62 Fed. Cl. 657, 662 (2004) ("[T]he determination of an agency's minimum needs is a matter within the broad discretion of agency officials . . . and not for [the] court to second guess.") (citations omitted).

The Court also notes that had Academy known that WMATA would be considering companies like TMS, it is not clear that Academy would have behaved any differently when

8

bidding on the task orders.  Academy argues that had it "known that WMATA would accept offers from brokers or logistic firms [like TMS], it could have factored that into its price proposal."  Pl.'s Reply at 7.  But at oral argument, counsel for Academy could only say that it might have lowered its bid and that it potentially could have submitted a different kind of proposal.  Such vague comments are speculative and do not concretely establish an injury.  *See Monument*, 540 F. Supp. 2d at 74 ("[T]he injury must be both certain and great, actual and not theoretical.").  Moreover, as explained by counsel for WMATA, the RFP required the bidders to present their best price.  The Court does not understand how knowing that TMS, and companies like TMS, could submit bids would have allowed Academy to submit a cheaper proposal.

Because the Court finds that Academy has not demonstrated that WMATA's procurement decision lacked a rational basis or was a clear and prejudicial violation of law, Academy has also failed to demonstrate a substantial likelihood of success on the merits.  Therefore, the motion for preliminary injunction is denied.[1]

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction is **DENIED** and Plaintiff's Motion for Leave to File is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  June 18, 2020                                                        RUDOLPH CONTRERAS
                                                                              United States District Judge

---

[1] While not essential to the Court's ruling, it notes that the balance of the equities and public interest factors also favor WMATA.  At oral argument, counsel for WMATA stated that a change in service providers would result in a serious disruption of bus service, which would delay essential workers and reflect poorly on WMATA and the construction project as a whole.  While Academy claims it would be able to seamlessly replace TMS with little to no disruption, the Court notes that even a slight disruption in this context would be against the public interest.  Moreover, given that TMS's proposal provided for a lower cost than Academy's, the public interest would also be served by the lowest cost bidder performing on the contract.